ÁNGEL SACARELLO BALS, Petitioner and Appellant, *v.* THE BOARD OF TRUSTEES OF THE EMPLOYEES' RETIREMENT SYSTEM OF THE INSULAR GOVERNMENT OF PUERTO RICO, ETC., Respondent and Appellee.

No. 10574. Argued May 4, 1953.—Decided July 31, 1953.

254

R. *Rivera Zayas, G. Rivera Cestero* and *Milton F. Rúa,* for appellant. *José Trías Monge, Attorney General (Víctor Gutiérrez Franqui, Former Attorney General,* on the brief). *José Antonio Arabía* and *A. Torres Braschi, Assistant Attorneys General,* for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

The Board of Trustees of the Employees' Retirement System of the Insular Government of Puerto Rico filed a motion to strike and to dismiss a petition for mandamus presented by Ángel Sacarello Bals for insufficiency of facts to constitute a cause of action.[1] After a hearing the trial court rendered an elaborate decision sustaining the motion to dismiss. Since in its opinion the petition was not susceptible of amendment, it ordered that it be dismissed, with costs to petitioner, but without including attorney's fees. A motion for reconsideration was filed and dismissed after another elaborate decision in which the court ratified its prior position. Based on the latter reasoning judgment was rendered dismissing the complaint. Petitioner appealed from that judgment and in support of his appeal he now assigns twelve errors. We need not discuss them in detail. It suffices to say in advance that the judgment appealed from will be affirmed, although on different grounds from those set forth by the trial court.

The petition for mandamus is most elaborate. It takes the first 19 pages of the judgment roll. Its essential allegations are, in brief, that for more than 23 years prior to the date of his separation the petitioner held several positions in the Insular Government of Puerto Rico; that in June, 1946 he was head of the Engineer's Division of the Bureau of Docks and Harbors, under the Department of the Interior, and that the disbursements of said Division were made by the San Juan Harbor Board; that pursuant to an Act of 1946, the Legislative Assembly dissolved said Board and ordered the transfer of its property and business to the Puerto Rico Transportation Authority; that then the Commissioner of the Interior appointed him engineer in charge of the Docks Works, which position was also known as head of the Division of Dock Works, under the Bureau of Public

---

[1] The motion to strike was not decided by the trial court, but the parties do not raise any question to that effect.

Works of that Department with a yearly salary of $4,500, which was later reduced to $4,000; that on December 26, 1946 the Bureau of the Budget eliminated, as of April 30, 1947, the Engineer's Division of Dock Works, and hence, the position of head of the Division which he was occupying; that due to the elimination of that position his employment ceased, and since he had been in service as a permanent employee more than 24 years and was over 45 years of age, he availed himself of the provisions of § 8 of Act No. 23 of July 16, 1935 (Spec. Sess. Laws, pp. 126, 134)[2] and requested the respondent Board to pay him the corresponding pension for involuntary separation, to which the Board agreed, granting him a pension of $2,000; that on January 22, 1948 the Personnel and Statistics Division of the Office of Personnel announced that his name had been certified for appointment as Civil Engineer IV, to the Commissioner of the Interior, with a monthly salary of $400, that since he was the only person certified for said position that Department was obliged to appoint him, and that if he declined said appointment the Retirement Board would be notified for all legal purposes; that on February 4, 1948 the Commissioner of the Interior wrote to the Director of the Office of Personnel that the positions of Civil Engineer IV and Head Engineer of the Division of Docks and Harbors were

---

[2] Section 8 of Act No. 23, *supra*, insofar as pertinent provides:

"If an official or employee of forty-five (45) years of age, to whom this Act is applicable, after he has served for a period of not less than twenty (20) years and before he is entitled to retire, is involuntary separated from the classified or unclassified Civil Service for any reason except removal, such official or employee shall be entitled to receive, from the date he ceases in office, fifty per cent of the salary he was drawing at the time he ceased in office until his reinstatement by the Civil Service Commission in a position equal or similar to that which he was holding. For this purpose, it shall be the duty of the said Commission to send, without any excuse or pretext whatsoever, the name of said employee to the head of the department where a vacancy occurs, and the latter shall appoint the said employee to fill the vacancy. If the employee so appointed should decline said appointment, the annuity he is receiving shall cease *ipso facto*, and the Retirement Board shall proceed to drop his name from the pensioners' pay roll; . . ."

in all respects completely different; [3] that on April 7 he was notified by the Administrative Official of that Department that the Personnel Board (*sic*) had ratified the certification of the petitioner for the position of Civil Engineer IV and that he should qualify on April 12; that as an answer he wrote to the Department of the Interior alleging that the position of Civil Engineer IV was not equal or similar to the position which he held as head of the Division of Dock Works when he ceased in office; and that on April 15 the Retirement Board informed him that his name had been eliminated from the retirement list as of the first of that same month; [4] that on May 28 he sent through his counsel a lengthy communication to the Retirement Board giving a whole report of the foregoing and requesting that his pension be renewed, that the decision eliminating him from the list be set aside and that, in any event, he be granted the opportunity of an administrative hearing before the Board to argue his case; that on October 13 he was notified by the Board that his petition had been considered and that its decision was final with respect to the suspension of his pension and that the appearance of his counsel was not considered necessary.

The petition further alleges that in the communication sent by petitioner to the respondent Board on May 28 it was stated that he had never received any appointment for a position equal or similar to the one he was discharging at the time he was retired from service; that no appointment was ever made for any position whatsoever and that even if the appointment as Civil Engineer IV would have been made, the same was null, void and had no legal effect on petitioner's pension "since the position of Civil Engineer IV is not equal or similar to the one he was holding as head of the Engineer's Division of Dock Works, when he ceased in office." The petition further describes the duties and responsibilities of the

---

[3] In the petition the letter in question is literally copied.

[4] The letter sent by the respondent Board to petitioner is also copied verbatim in the complaint.

position of Civil Engineer IV and those of Head Engineer of Dock Works,[5] stating also that during his 24 years of service to the Government of Puerto Rico he always contributed to the Retirement Fund. The petition concludes alleging that the Board erred in suspending his pension: (1) because he has not received any appointment equal or similar to the one he was holding when he ceased office as head of the Division of Dock Works of the Department of the Interior; (2) because he has received no appointment as Civil Engineer IV; (3) that even assuming that he has received an appointment for this last position the same is null and void "since that position is not equal or similar to the one he had been holding . . . when he ceased office"; (4) because no evidence at all was introduced before the Board which justified the elimination of his name from the Government's retirement list of involuntary separations; (5) because the Board refused to consider his offer to substantiate the facts set forth in the preceding paragraphs, and (6) because in withdrawing his name from the list the Board did not comply with the provisions of § 8 of Act No. 23, since he "has not received an appointment for an equal or similar position nor has he declined the offer of a position equal or similar to the one he was holding at the time he ceased in office as head of the Division of Docks and Harbors."

It is not necessary to go into the details of the reasoning adduced by the trial court in its lengthy decisions in order to reach the conclusion that the petition as drafted does not state facts which constitute a cause of action. The crux of the reasoning was that without question the Civil Service Commission was the agency to decide whether the petitioner should continue receiving his pension or should be reinstated to the government which he previously served;

---

[5] In holding that said positions are not equal or similar, the petitioner copies besides in his petition the letter sent by the Commissioner of the Interior to the Director of the Bureau of the Budget on September 30, 1946. The letter details the chief duties assigned to the Engineer's Division of Dock Works.

that by virtue of Act No. 345 of May 12, 1947 (Sess. Laws, p. 594), establishing the Office of Personnel, the Commission was abolished and all its records, contractual rights or obligations were transferred to the Office of Personnel; [6] that it was incumbent on the Office of Personnel to determine whether the position to which petitioner would be reinstated was one of an equal or similar nature to the one he had been holding at the time of his retirement; that the fact that the Commissioner of the Interior differed from the opinion of the Office of Personnel over the likeness or similarity of the position for which petitioner was certified with the abolished position was not controlling; that the law granted to petitioner a remedy, that is, to ask the Office of Personnel for a reconsideration and if denied, to appeal and obtain a hearing before the Personnel Board; that nothing would have been gained by having a hearing before the Retirement Board; and that the petitioner had not exhausted his administrative remedy.

██ A motion to dismiss such as the one presented in this case by the defendant has the scope and effect of the demurrer provided by § 105 of the Code of Civil Procedure, that is, it admits the truth of the essential averments of the complaint. *Rivera* v. *People*, 73 P.R.R. 841; *Boulon* v. *Pérez*, 70 P.R.R. 941; *cf. Serra* v. *Transportation Authority*, 68 P.R.R. 581; *Acuña* v. *Pension Board*, 58 P.R.R. 96, 102.

██ Accepting as true the essential averments of the petition, does it state facts sufficient to constitute a cause of action? Certainly not. We now pass to consider why we answer in the negative.

Pursuant to § 6 of Act No. 345 of 1947, *supra:*

"In addition to the duties imposed upon the Board by other provisions of this Act, it shall be the duty of the Board:

". . . . . . . .

"(6) *On appeal,* and at the request of interested party, *to investigate and decide* controversies arising in connection with

---

[6] See § 41 of Act No. 345, *supra.*

the following matters: *dismissals, suspensions, terminations, separation of working test employees, demotions,* and *allocation and reallocation of positions.* . . .

"*The decisions of the Board shall be final, except in cases of removals, in which cases review proceedings may be brought in the district court of the district where the employee removed had been serving.*" [7] (Italics ours.)

It is crystal clear that petitioner's case is not one of removal, or of suspension, termination, separation of work as a test employee or of demotion. It is possibly a case of allocation or reallocation of a position. In connection with the allocation or reallocation of positions, § 10 of Act 345, *supra,* orders the Director of Personnel after consultation with appointing authorities and other supervisory officials, to ascertain the duties and responsibilities of all positions in the competitive and non-competitive service and to group such positions into classes to form a classification plan. And § 11 of the same Act provides that "as promptly as possible after the adoption of the classification plan, the Director *shall allocate* each position in the competitive service and in the non-competitive service to the appropriate class therein," and that "any employee affected by any *allocation* or *reallocation* of a position shall have the right to file with the Director a formal request for reconsideration thereof, and, upon dismissal thereof, he may appeal to and obtain a hearing in the Personnel Board." [8] . Thus, the latter Act

---

[7] Paragraph 6 of § 6, *supra,* was amended by Act No. 406 of May 11, 1951 (Sess. Laws, p. 1074), and at present reads thus:

"On appeal, and at the request of interested party, to investigate and decide controversies arising in connection with the following matters: dismissals, suspensions, terminations, separation of working test employees *for political, religious or racial reasons,* and demotions." (Italics ours.)

The amendment consists, as we have seen, of the addition of the words "for political, religious or racial reasons," and in the elimination of the words "allocation and reallocation of positions" which appeared in the original Act.

[8] Section 11, *supra,* amended by Act No. 406 of 1951, eliminated the right of any employee affected by any allocation or reallocation of a position to request a reconsideration, and upon dismissal, to appeal to the Personnel Board.

provides in a clear and conclusive manner who shall prepare the Classification Plan, who shall examine each position in the competitive and non-competitive service and the rights of every employee aggrieved by any allocation or reallocation. Consequently, if the question is one of allocation or reallocation of petitioner's position, the Director of Personnel was the one called to determine the classification of the position for which he was certified. He decided that the position offered to petitioner and his former position were equal or similar. Against that determination petitioner's only remedy, pursuant to the clear language of paragraph 2 of § 11(c), was to file with the Director of Personnel a formal request for reconsideration and if denied, to appeal and obtain a hearing in the Personnel Board. Petitioner did nothing of the sort.

On the other hand, § 19 of Act No. 345, *supra*, provides that "the Director shall establish and maintain *re-employment lists*, which shall contain the names of persons who have been regular employees and who were separated from their positions for reasons other than fault or delinquency on their part," and § 26 provides that "at the request of the Board of Trustees of the Employees' Retirement System of the Insular Government and its Instrumentalities, the Director (of Personnel) may approve, in the case of an employee who is eligible for or is receiving an annuity or benefit for occupational or non-occupational disability, the *reassignment* or *re-employment* of such employee to a position in a class the compensation for which is equal to or higher than the amount of the disability annuity or benefit to which such employee would otherwise be eligible. ..." [9] (Italics ours.) However, in the case of re-employment the Act does not even grant the employee or official aggrieved the right to appeal

[9] Section 2, paragraph 13, of Act 345 of 1947 provides that:

" 'Re-employment List' shall mean a list of persons who have been regular employees in a particular class and who are entitled to have their names certified for appointment to positions in that class."

to the Personnel Board from the act of the Director in placing his name in the Re-employment List.

We therefore conclude that if the act of the Director of Personnel in offering petitioner the position of Civil Engineer IV was equivalent to the allocation or reallocation of a position, the petitioner did not exhaust his administrative remedy. *Medina* v. *Hato Rey Realty Co.*, 72 P.R.R. 595, 600. And if it was a case of re-employment the act of the Director of Personnel was final.[10] In either case since it was not a removal, petitioner is not entitled by law to appeal to the courts to decide the question. It is only in case of a removal that an appeal may be taken from the decisions of the Personnel Board. The fact that in all other cases the employee or official aggrieved by the act of the Personnel Board may not appeal· to the courts in search of a remedy is not contrary to due process of law, since no one has a vested right to hold a public office. The latter constitutes a privilege. *Ramspeck* v. *Federal Trial Examiners*, 344 U. S. 128; *Goldway* v. *Board of Higher Education*, 37 N. Y. Supp. 2d 34; *Reese* v. *Dempsey*, 152 F. 2d 157, 163; *Butterworth* v. *Boyd*, 82 P. 2d 434, 126 A.L.R. 838; *McAuliffe* v. *New Bedford*, 155 Mass. 216, 220, *cf. Estep* v. *United States*, 327 U. S. 114, 120; *Fitzgerald* v. *Douds*, F. 2d 714, 717.

█ Petitioner contends most emphatically that no appointment was given to him for the position of Civil Engineer IV. Undoubtedly, pursuant to § 8 of Act No. 23, *supra*, a retired employee under the conditions of his retirement is entitled to receive an annuity until he is re-employed by the Civil Service Commission (new Office of Personnel) in an equal or similar position to the one that he held when he retired. There is also no doubt that the duty of that Office is to communicate the name of the employee thus retired to the head of the department where the vacancy occurs, that the latter *shall appoint* the employee to the vacant position,

---

[10] It is the same when a mere reinstatement is involved.

that, "if the employee *so appointed* should decline said appointment, the annuity he is receiving shall cease *ipso facto*, etc." (Italics ours.) However, from the averments of the complaint it appears that the Personnel and Statistics Division of the Office of the Personnel notified petitioner by letter of January 22, 1948, that his name had been certified to the Commissioner of the Interior for the position of Civil Engineer IV, and that in the letter he was told that pursuant to the aforesaid act "petitioner was the only person certified for the aforesaid position and the Department of the Interior was bound to appoint him in that position." It also appears from the complaint that on April 7 of the aforesaid year petitioner was notified by the Administrative Official of the Department of the Interior that the Personnel Board (*sic*) had ratified the afore-mentioned certification, that "the petitioner should qualify on April 12" and that "petitioner wrote to the Department of the Interior in answer to the letter... that the aforesaid position of Civil Engineer IV was not equal or similar to that which he was holding... at the time he ceased in office, and that there was no similarity whatsoever in those positions."

The aforesaid letter of the Administrative Official was in no way equivalent to a delegation of the power of appointment which the Commissioner of the Interior had[11] in connection with the subordinate employees and officers of his department. The letter did not appoint petitioner to the position of Civil Engineer IV. He was merely told to qualify for said position on April 12 of that same year. The latter official could, of course, draft and send a letter conceived in such terms. Its content was mere office routine that could be performed by any subordinate employee or official as long as he was authorized to do so by the Depart-

---

[11] We say had because at present the position is known as "Secretary of Public Works." See § 6 of Article IV of the Constitution of the Commonwealth of Puerto Rico.

ment Head. There is no contention here that the Administrative Official was not authorized to write the letter he did.

██ In weighing the validity of a motion to dismiss for insufficiency, the duty of the court is not to test the final merit of the claim in order to determine which party is to prevail—whether plaintiff or defendant—but rather to consider whether in the light most favorable to the plaintiff and with every doubt resolved in his favor, the complaint is sufficient to constitute a valid claim—*González* v. *Hawayek*, 71 P.R.R. 493; *Boulon* v. *Pérez*, 70 P.R.R. 941. However, that does not mean that in every case where a motion to dismiss of that nature is presented the plaintiff must necessarily prevail. The former rule has as an exception those cases in which notwithstanding laxity in interpreting the allegations of a complaint, the court after studying them is fully convinced that ultimately the plaintiff will not prevail. That is precisely our criterion in this case. From the very averments of the complaint, admitted as true for present purposes, it appears that petitioner's name was certified by the Office of Personnel for a position equal or similar to the one he was holding at the time he retired, that he was notified in writing that he should present himself to the Department of the Interior to qualify, that as we interpret it, if petitioner had gone to the Department of the Interior on the date indicated in the written notice, the corresponding appointment would have been made by the Commissioner of the Interior, and that in answering as he did, petitioner declined the appointment offered. We mention the foregoing because it is unquestionable that his name was certified by the Office of Personnel to the Commissioner of the Interior for a position equal or similar to that which he had at the time of his involuntary separation; because by an express provision of the statute when the Commissioner received the certification of petitioner's name for the position of Civil Engineer IV, the former had no other alternative

than to extend him an appointment therefor—"that official duty has been regularly performed," and "that the law has been obeyed" § 102, paragraphs 15 and 32 of the Law of Evidence,—are presumptions of law; because it should be presumed that if the petitioner had gone to the Department of the Interior on April 12, 1948, as required by the letter sent to him by the Administrative Official, the Commissioner of the Interior, complying with the express provision of § 8 of Act 23, *supra*, would have extended an appointment in his favor for the position offered him; and because it was petitioner himself who in thus answering the Department as he did, declined the appointment for the reason adduced. This being the case, the petitioner can never prevail. The truth is that if the appointment required by law was not made for the position of Civil Engineer IV, it was solely and exclusively due to petitioner's act in declining it. He is now, therefore, estopped from alleging that he was not appointed for the position for which he was certified, that he did not decline, and that he is entitled to the remedy requested.

Section 208 of the Political Code plays no important role in this case. Insofar as pertinent it provides that "an office becomes vacant on the happening of any of the following events before the expiration of the term: (1) The death of the incumbent... (9) His refusal or neglect to file his official oath or bond within fifteen days after his term of office has commenced in accordance with law." It should be remembered that in the afore-mentioned letter of the Administrative Official dated April 7, 1948, petitioner was told to appear on the 12th of that same month to qualify for the position of Civil Engineer IV. It is undeniable that from the date of the letter until the day Sacarello Bals had to qualify the term of 15 days had not elapsed, but the appointing power may always tell the person appointed the date when he should appear to qualify for the position offered, as long as, of course, between the date of the appointment and the date

to be sworn in, a period not greater than 15 days has elapsed. If that term should expire, a new appointment must be made. However, if as in this case, the person appointed is given a shorter term than 15 days to appear and qualify, it is his duty to state the reason why he can not accept and to request, if he so desires, that the complete period of 15 days be granted. In this case, however, the petitioner did not request in any manner the extension of the term; on the contrary, he immediately answered the letter of the Administrative Official indicating why he would not qualify for the position offered. His act in so doing was undoubtedly tantamount to declining the position offered.[12]

In any event, the remedy sought against the Retirement Board does not lie, since its act in the instant case was limited to complying with the ministerial duty imposed by § 8 of Act 23 of 1935, *supra*, when it was notified by the Office of Personnel that the petitioner had declined to accept an equal or similar position to the one he was holding when he retired.

For the foregoing reasons the complaint does not state sufficient facts to constitute a cause of action and the judgment appealed from shall be affirmed.

---

MR. JUSTICE NEGRÓN FERNÁNDEZ, dissenting.

The right of an employee who has been involuntarily separated from work to a pension under the provisions of § 8 of Act No. 23 of July 16, 1935 (Spec. Sess. Laws, p. 126) can not be forfeited by mere administrative *fiat*. To deprive him of that right, the State must comply strictly with such conditions as the latter Act establishes as *sine qua non* requirements for the discontinuance of such pensions. Those

---

[12] Section 186 of the Political Code, as amended by Act 93 of May 13, 1936, (p. 490) and by Act 14 of July 24, 1952 (Spec. Sess. Laws, p. 74) provides that "...all executive, administrative and judicial officers, and all employees of the Insular Government of Puerto Rico...before they enter upon the duties of their respective offices or employments" shall take and sign an oath or affirmation appearing therein.

conditions are the following: (1) That the Civil Service Commission (now Office of Personnel, Act No. 345 of May 12, 1947—Sess. Laws, p. 594) send the name of the retired employee to the head of the Department where a vacancy occurs of a position *equal or similar* to that which he was holding when he involuntarily ceased office; (2) that the head of the Department *appoint* the employee to fill the vacancy; and (3) that the employee *so appointed declines* the appointment.

Requirement No. (1) was, in my opinion, fulfilled, for the Office of the Personnel certified the name of the petitioner to the Commissioner of the Interior for appointment as Civil Engineer IV, although it is alleged that the position was not "equal or similar" to his former office. This question is not, in my opinion, for judicial determination, whether or not petitioner followed the stated course of administrative procedure. Due to its essentially technical character, the Legislature delegated the power of classifying, allocating and reallocating positions in the public service to the Director of the Office of the Personnel—and, on appeal, to the Personnel Board, until the latter power was eliminated by Act No. 406 of May 11, 1951 (Sess. Laws, p. 1074)— and made no provision for judicial review of those administrative acts. The latter functions, by their nature, are not a matter which constitutionally require judicial review. *Estep* v. *United States*, 327 U. S. 114, 90 L. ed. 567; Schwartz, A Decade of Administrative Law; 1942–1951, 51 Mich. L. Rev. 775, 837, *cf. Federal Reserve System* v. *Agnew*, 329 U. S. 441, 91 L. ed. 408. And although the absence of statutory provisions for review does not preclude review in proper cases, it is precluded in a case like the one at bar where the court is called upon to make technical determinations which are not inherent in judicial power. They are inherent in an administrative agency authorized by law to do so in the exercise of delegated legislative power.

The petitioner had status in the Civil Service Commission (Office of Personnel), derived from the Retirement Act itself, to be heard by the Personnel Board, in an administrative review of the technical determination made by the Director, of which he was timely notified. He did not appear before the Board and now he desires judicial review, unauthorized by the statute, to take the place of administrative review. He is not favored, on that particular, by law. As a retired employee, he can not expect more rights, with respect to the classification or allocation of the position for which he was certified, than those enjoyed by other employees with respect to the classification or allocation of the positions which they actually hold. When Act No. 23 of July 16, 1935 (Spec. Sess. Laws, p. 126) was enacted—imposing by § 8 on the Civil Service Commission (Office of Personnel) the duty of certifying an employee who is involuntarily retired for an "equal or similar" position—the Civil Service Act, No. 88 of May 11, 1931 (Sess. Laws, p. 534) was in force, and its §§ 13, 14 and 15 granted the Commission the power of classifying and allocating the positions in public service in a manner similar to that conferred by Act No. 345 of 1947 (Sess. Laws, p. 594) on the Director of the Personnel. When the Legislature, pursuant to the Retirement Act, delegated to the Civil Service Commission, that is, the administrative agency authorized by law to classify public offices, the determination of the "equal or similar" nature of the position for which an employee involuntarily separated from office should be certified, it recognized as applicable for the purposes of the Retirement Act as to that matter the technical determinations of the Commission (now Office of Personnel) as well as the proceedings that the Civil Service Act (now Personnel Act) might provide for its review, if any, thereby integrating a rational and co-ordinated system for the efficient operation of that aspect of the Retirement Act, in harmony with the essential purpose of the Civil Service Act.

Requirement No. (2), in my opinion, was not fulfilled. The statute imposes the *duty* to appoint—there already was the power to do so—on the *Head of the Department* where the vacancy occurs. When the Legislative Assembly vests a public officer with the appointing power, the officer may not delegate that power, nor may any other person exercise it in his name, unless expressly so authorized by law. There is no such statute in our legislation.

Since the power of appointment may not be delegated, a power which in the case at bar was exercised by the then Commissioner of the Interior, and since the law does not authorize the administrative officer of that Department to make appointments either by himself or in the name of the Commissioner, it is obvious that the letter of April 7, 1948 of the administrative officer notifying petitioner that he should appear on the 12th of that month "to qualify," is not, and does not constitute, nor can it be or constitute, an *appointment* from the Commissioner of the Interior, in strict compliance with his duty pursuant to § 8 of the Act in issue, to *appoint* petitioner to the position for which he was certified. At most, the letter might be considered as a notice of the *intention* of the Commissioner to appoint him on April 12, as the majority opinion admits when it says that it should be presumed that on that date the Commissioner "would have extended an appointment in his favor for the position offered him." But § 8 of the Act is not fulfilled by presumptions, nor by the announcement of future events through a notice of the *intention* to appoint. The statute requires affirmative acts, which must be accomplished by the appointing authority as well as by the pensioner, in order that the latter may be deprived of his pension. The facts alleged in the complaint show noncompliance on the part of the Commissioner with the duty of appointment imposed on him by law. The magnitude of the error in the Court's opinion is of alarming proportions if we stop to consider that we have

before us a motion to dismiss, and that, disregarding the rules which should govern the case at this stage of the proceeding, *González* v. *Hawayek*, 71 P.R.R. 493; *Boulón* v. *Pérez*, 70 P.R.R. 941, the allegations of the complaint are construed against the right claimed, thereby foreclosing whatever opportunity the courts may have to correct a mistake or undo an injustice.

Since requirement No. (2) was not fulfilled, it is obvious that requirement No. (3) could not have been fulfilled either. Petitioner's letter of April 12, 1948 bears no sign that he *declines* an appointment. If we read the Spanish within the meaning of those words in our rich language, the fact of disagreement with some future action does not mean a refusal to take part in such action once accomplished. The letter could rather be labelled as a notice of appeal—erroneously filed with the Commissioner—from the decision of the Director of the Personnel.

Finally, I only wish to point out an additional reason which in my opinion warrants the reversal of the judgment. Under the allegations of the complaint, the letter of the administrative officer to the petitioner requiring that he appear on the 12th, "to qualify" was sent to him on April 7—five days before. On April 15, eight days after the administrative officer wrote the letter, the Retirement Board eliminated petitioner's name from the retirement list *as of the first of that same month* and notified him of its action on that date. Independently of the fact that the Board's action affected retroactively—from April 1st—petitioner's right to his pension, it is possible that he was deprived of it prematurely and unlawfully. Even assuming that the letter of the administrative officer constituted the *appointment* that the Commissioner was bound to make under the afore-cited § 8, in the absence of a communication by the petitioner declining it, he was entitled under § 208 of the Political Code as amended by Act of March 6, 1909, in connection with

§ 186, as amended by Act No. 93 of May 13, 1936—both in force at the afore-mentioned date—to a term of 15 days to take the oath and qualify for the position, which term,— assuming such was the case—was ignored in the letter of April 7 when he was required to appear on the 12th "to qualify" as well as in the letter of the Retirement Board of April 15 when he was notified that his name had been eliminated from the retirement list.

The facts alleged in the complaint are sufficient to constitute a cause of action whether it be *mandamus, declaratory judgment* or an ordinary *civil action*, for they clearly indicate (1) that petitioner received no appointment; (2) that he declined no appointment; (3) that on the assumption that there had been an appointment, petitioner's statutory period to take an oath and qualify was limited and (4) that the Retirement Board deprived petitioner prematurely of his pension. If under those conditions, we state that petitioner is not entitled to his day in court, we are indeed witnessing a retrogression in our basic concept of justice.

MR. JUSTICE SIFRE, dissenting.

I agree that the question concerning the equality or similarity of position can not be discussed in the mandamus filed against the Retirement Board. I dissent, however, from the conclusion that the complaint does not state facts sufficient to constitute a cause of action. The complaint should not have been dismissed on that ground in view of the fact that it is alleged that petitioner was not appointed for any position. The truth of that averment was admitted for the purpose of the motion to dismiss. The conclusion reached by the Court that the petitioner declined the position of Civil Engineer IV and prevented his appointment for that position, is based on petitioner's answer when notified by the administrative Head of the Department of the Interior to appear to qualify for the latter position: "the position

of Civil Engineer IV is not equal or similar to the position which he held . . . when he ceased in office," and the positions were in all respects completely different. That statement is not susceptible to only one interpretation which the majority gives it, to wit, that it amounts to a refusal to accept the appointment. In view of the allegation that petitioner was not appointed for any position, and considering that petitioner's answer to the administrative head of the Department of the Interior does not exclude, as a question of law, a different interpretation from the one given by the court, the legal effect thereof should have been determined after hearing the evidence, and with knowledge of all the circumstances.

It is a well-settled rule that in deciding the validity of a motion to dismiss for insufficiency, the duty of the court is to decide whether "in the light most favorable to the plaintiff, and with very intendment regarded in his favor, the complaint is sufficient to constitute a valid claim." The majority opinion is contrary to that doctrine, which we sanctioned in *Boulón* v. *Pérez*, 70 P.R.R. 941. The doubt, (I refer to the interpretation given to petitioner's answer to the administrative head of the Department of the Interior), has been decided against the petitioner.

Irrespective of that doctrine, it seems evident to us that no one should be deprived of his pension unless it is clearly shown that he has lost his right to it. The laws that grant the right to a pension, should be liberally interpreted, in order that there be compliance with legislative purpose. *Acuña* v. *Pension Board*, 58 P.R.R. 96.

By affirming the judgment appealed from we deprive the petitioner of his pension, and leave him helpless without remedy.

Such is the result of deciding against him any doubt that may possibly arise from his allegations and of construing the law that creates the right to a pension in an ultra restrictive fashion against petitioner.

Mr. Justice Belaval, dissenting.

I do not agree with the opinion delivered by Mr. Justice Marrero, and while I join in the dissenting opinions of Mr. Justice Negrón Fernández and Mr. Justice Sifre, I wish to add separately other grounds for my dissent from the majority opinion.

The juridical facts, that is, those facts extracted from the entire evidence on which the judicial decision is based are the following: (1) on December 26, 1946 the Bureau of the Budget of Puerto Rico eliminated the Engineer's Division for Dock Works of which petitioner was in charge; (2) inasmuch as petitioner had served for 24 years as a permanent employee and was over 45 years of age, he retired under the provisions of § 8 of Act No. 23 of July 16, 1935 (Spec. Sess. Laws, p. 126); said § 8 provides that the pensioner "shall be entitled to receive, from the date he ceases in office, fifty per cent of the salary he was drawing at the time he ceased in office until his reinstatement by the Civil Service Commission *in a position equal or similar* to that which he was holding. For this purpose, it shall be the duty of the said Commission to send, without any excuse or pretext whatsoever, the name of said employee to the head of the department where a vacancy occurs, and the latter shall appoint the said employee to fill the vacancy. If the employee so appointed should decline said appointment, the annuity he is receiving shall cease *ipso facto*, and the Retirement Board shall proceed to drop his name from the pensioner's pay roll"; (3) on January 22, 1948 the Division of Personnel and Statistics of the Office of Personnel notified petitioner that his name had been certified to the Commissioner of the Interior for the position of Civil Engineer IV and that since he was the only person certified for said position that Department was bound to appoint him, and that should he decline the Retirement Board would be notified as to the legal consequences; (4) that on February 4, 1948, the Commissioner of the Interior notified the Director of the

Office of Personnel that the positions of Civil Engineer IV and that of Head Engineer of the Division of Docks and Harbors, which was the position originally held by petitioner, *were in all respects completely different;* (5) that on April 7, 1948 the petitioner was notified, this time by the Administrative Official of the Department of the Interior, that since the Personnel Board had rejected the objections of the Commissioner of the Interior, he should appear *on April 12, 1948* to qualify; (6) that petitioner answered the letter of the Administrative Official alleging that the position that he was offered *was not equal or similar* to the position that he held when he ceased in office; (7) that the only answer he received was a letter from the Retirement Board on April 15, 1948 notifying him that his name had been eliminated from the retirement list as of April 1, 1948.

It should be noted that the certification of the new position was made by the Director of Personnel without granting petitioner an opportunity to be heard, notwithstanding that petitioner was a pensioner, with specific rights granted by § 8 of Act No. 23 of July 16, 1935, and not an employee, properly speaking; that the only controversy on the likeness or similarity of the two positions at issue was between the Commissioner of the Interior, who was the appointing power, and the Director of Personnel, without granting petitioner an opportunity to be heard in the administrative adjudication of his rights; that when the Director of the Personnel overruled the objections of the Secretary of the Interior, petitioner was only told of his obligation to appear before the appointing power to qualify; that when he complained to the appointing power that the new position *was not equal or similar* to the one he held, he only received a decision from the Retirement Board, an entirely different entity, notifying him that his name had been eliminated from the retirement list. In my opinion this is a typical case of the forfeiture of a right without due process of law. When a pensioner believes that the position for which he has been certified is

not equal or similar to the position he held when he. retired, the Retirement Board should hold a hearing before definitively disposing of the pension of the retired employee, for the law establishes as a condition of his obligation to return to. public service that his new position *be equal or similar* to the one previously held by him. The determination that the position is of an equal or similar category or that the pensioner, upon being offered an equal or similar position declines it, is the responsibility of the Retirement Board and it is this Board which must comply with due process of law.

I believe that one of the unavoidable duties of the judiciary is to keep within the greatest degree of certainty those constructions of law which sooner or later are to be uniform judicial rules. At times it is not possible, within the ever-varying situations arising in the science of law, to establish a uniform judicial rule, and the judicial decision must be limited to the merits of the question at issue. At times, however, a uniform rule can be established to serve as a guidepost for trial courts and attorneys of the bar.

This is a case where the essential question turns on the authority of the "judiciary" to interfere with the decision of an administrative agency, when the statute concerned is silent on the question of subsequent judicial review. The question is too conflicting in our present case law to dismiss it with a simple no and still pretend to keep within the margin of the issue.

The administrative adjudication of certain questions which were traditionally decided in the trial courts, is a delegation of legislative authority. The administrative bodies, as we know them now, are essentially legislative agencies of the government. It is constitutionally valid for the legislature itself to act, or to delegate to another body created for such purposes any function strictly within the legislative sphere. Democratic practice has shown that in some aspects of the legislative field, such as the approval of rates for public service, regulation of public franchises,

adoption of uniform wage scales, classification of public employees or price control, it was necessary to create certain legislative bodies which could perform more adequately and with a greater expenditure of time, the functions traditionally entrusted to the legislative branch. Democratic practice has also shown that for the adjustment of the taxing system, for the integral planning of economic resources, and for the regulation of some individual actions which decisively affect the economy, it is more desirable to create a number of expert agencies, whose conclusions on technical matters might prove wiser than the findings made by the traditional courts on the same issue in litigation.

When it was a question of legislative agencies and not of constitutional bodies, the legislature in order to prevent conflict with the constitutional limitations imposed on the legislative power, adopted two interchangeable designs: (1) a subsequent review by the judical branch, in those cases in which there might exist, within the administrative adjudication, an adjudication of justiciable individual rights and, (2) giving finality to those technical aspects of the evidence which the legislative branch itself could have regulated. Thus, the legislature delegated part of its legislative power, within the authority which it could constitutionally exercise, and did not delegate any part of the judicial power, a delegation it could not constitutionally exercise. This simple formula of legislative wisdom is hard to grasp within the feverish debate that arose over justiciability. From this formula of legislative wisdom three types of statutes emerge: (1) those that expressly grant judicial review; (2) those that are silent on judicial review, and (3) those that give finality to the findings of technical fact made by administrative tribunals.

1. When concerned with a statute granting judicial review subsequent to an administrative proceeding, the courts are entitled to the following judicial determinations: (1) to set aside an order of an administrative tribunal for any

error of law, substantive or procedural: *Interstate Commerce Commission* v. *Union P. R. Co.*, 222 U. S. 541, 547, 56 L. ed. 308, 311 (Lamar) (1912); (2) to set aside an order of an administrative tribunal where the finding purports to be a finding upon a question of fact, when in legal reality the facts are so involved with and dependent upon questions of law, that should the finding be upheld it would clearly be equivalent to impairing the supremacy of law; compare *Kansas City S. R. Co.* v. *C. H. Albors Commission Co.*, 223 U. S. 573, 591, 56 L. ed. 556, 566, (Van Devanter), (1912) with *Cedar Rapids Gaslight Co.* v. *Cedar Rapids*, 223 U. S. 655, 668, 669, 56 L. ed. 594, 604, (Holmes) (1912); (3) to set aside an order of an administrative tribunal which lacks the necessary supporting findings; *Florida* v. *United States*, 282 U. S. 194, 212, 215, 75 L. ed. 291, 302–304, (Hughes) (1931); (4) to set aside an order of an administrative tribunal because the corresponding findings are made without supporting evidence; *Akron C. & Y. R. Co.* v. *United States*, 261 U. S. 184, 203, 67 L. ed. 605, 615, (Brandeis), (1923); (5) to set aside an order of an administrative tribunal because the corresponding conclusion is not compatible with the correct inferences from the evidence; *San Diego Land & Town Co.* v. *Jasper*, 189 U. S. 439, 442, 47 L. ed. 892, 894, (Holmes), (1903); (6) to set aside an order of an administrative tribunal because it was based on evidence not legally cognizable: *United States* v. *Abilene & S. R. Co.*, 265 U. S. 274, 286–290, 68 L. ed. 1016, 1021–1023, (Brandeis), (1924); (7) to set aside an order of an administrative tribunal because facts and circumstances which ought to have been considered were excluded from consideration before the corresponding conclusion is reached: *Interstate Commerce Commission* v. *Northern P. R. Co.*, 216 U. S. 538, 544, 545, 54 L. ed. 608, 609, (Holmes), (1910); *Northern P. R. Co.* v. *Department of Public Works*, 268 U. S. 39, 44, 69 L. ed. 836, 840, (Brandeis), (1925); (8) to set aside an order of an administrative tribunal because

certain facts were considered which should not legally have influenced the corresponding conclusion: *Interstate Commerce Commission* v. *Diffenbaugh*, 222 U. S. 42, 46, 47, 56 L. ed. 83, 87, 88 (Holmes), (1911); *Florida East Coast R. Co.* v. *United States*, 234 U. S. 167, 187, 58 L. ed. 1267, 1272, (White), (1914); (9) and the most important of all, to set aside an order of the administrative tribunal because it is confiscatory, from a constitutional point of view: *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 50–52, 80 L. ed. 1033, 1041–42, (Hughes, writer of the opinion, Roberts, concurring, Brandeis, concurring in a separate opinion, Stone and Cardozo, concurring in the result), (1936). The doctrinal repertoire above cited up to number 8 is taken from the concurring opinion of Justice Brandeis in *St. Joseph Stock Yards* v. *United States, supra*, 80 L. ed. at p. 1053.

2. When dealing with a statute that is silent concerning subsequent judicial review, silence is not necessarily to be construed as a denial "of the power of the courts..., to grant relief in the exercise of the general jurisdiction... conferred upon them." *Estep* v. *United States*, 327 U. S. 114, 571, 90 L. ed. 567, 571 (Douglas, writer of the opinion, Murphy, concurring in a separate opinion, Rutledge concurring in a separate opinion, Frankfurter, concurring in the result in a separate opinion, Burton, with whom Chief Justice Stone concurs, dissenting), (1946). On the contrary, it should be construed that "the responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts... by the statutes establishing courts and marking their jurisdiction." *Stark* v. *Wickard*, 321 U. S. 288, 307–309, 88 L. ed. 733, 748, (Reed, writer of the opinion, Black, concurring without opinion, Frankfurter, dissenting in opinion), (1944). As to any possible deprivation of a constitutional right, the language used by concurring Justice Murphy, in *Estep* v. *United States, supra*, at pp. 127–129 U. S. 575–576 L. ed.

(1946) : "Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority," leaves no room for doubt as to the obligation of the traditional courts to interfere at any time in favor of a party whose constitutional rights might have been impaired.

3. As to the statutes that give finality to the findings of technical facts of administrative agencies, they should not be construed to also give finality to conclusions of law. We should not be unmindful that such agencies act as true legislative bodies to determine the facts in accordance with the minimum standards of law. Instead of incorporating them into the statute in the traditional manner, the legislature delegates to an administrative body the investigation of the technical facts. But by the same token that the legislature would not have constitutional power to approve a confiscatory statute, neither would it have power to endow an administrative body with authority to make findings which are conclusive in an arbitrary manner: *Ali Gegiow* v. *Uhl*, 239 U. S. 3, 9, 60 L. ed. 114, 118 (Holmes) (1915) ; *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 52, 80 L. ed. 1033, 1041, (Hughes) (1936), *Estep* v. *United States* (Murphy concurring), at p. 576: "A contrary result certainly is not dictated by the fact that the Act makes local board decisions '*final*,' subject to the administrative appeal provisions. This merely determines the point of administrative finality, leaving to the courts the ultimate and historical duty of judging the validity of the 'final' administrative orders ..."

But whether dealing with statutes which expressly grant a judicial review, or statutes silent on judicial review, or making conclusive the administrative adjudication, it is clear that neither the legislature by itself, nor the administrative body with delegated power may, by itself, design

a system whereby a private right may be confiscated without due process of law: *Joint Anti-Fascit Refugee Com.* v. *Mc Grath*, 321 U. S. 124, 149–151, 162–164, 164–175, 177–179, 95 L. ed. 818, 842, 849, 850, 857, (Burton, writer of the opinion, Douglas, concurring with the opinion, Black concurring in a separate opinion, Frankfurter, concurring in a separate opinion, Jackson, in a separate opinion, Reed, Vinson and Minton, dissenting in a separate opinion written by Reed) (1951) ; *Estep* v. *United States, supra,* at p. 576 (L. ed.) ; *Garfield* v. *United States Ex Rel Goldsby,* 211 U. S. 249, 262, 53 L. ed. 168 (Day) (1908) at p. 175 L. ed.

In *Joint Anti-Fascit Refugee Com.* v. *McGrath, supra,* the concurring opinion of Justice Felix Frankfurter contains one of the best expositions of the modern concept of due process of law: "Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process..." at p. 849 L. ed. "This Court is not alone in recognizing that the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society. Regard for this principle has guided Congress and the Executive. Congress has often entrusted, as it may, protection of interests which it has created to administrative agencies rather than to the courts. But rarely has it authorized such agencies to act without those essential safeguards for fair judgment which in the course of centuries have come to be associated with due process...and when Congress

has given an administrative agency discretion to determine its own procedure, the agency has rarely chosen to dispose of the rights of individuals without a hearing, however informal. The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights," at pp. 852–853 L. ed.

Mandamus in civil actions has fulfilled a function similar to the one fulfilled by habeas corpus in criminal actions. Its elasticity has saved it from disuse in different stages of law. Historically considered, it was a writ issued in the name of the sovereign against the abuses of the feudal courts. It comes to Angloamerican law as a remedy to prevent the inertia or the abuse of discretion of public officers. With the appearance of administrative agencies with authority delegated by the legislature to complete the compound of the law, the availability of mandamus grew rather than diminished. See: Mandamus to Review State Administrative Action—Foster H. Sherwood—45 Michigan Law Review, 123 (1946). As soon as the primary administrative jurisdiction comes to an end, mandamus, as an extraordinary remedy of judicial nature, will issue.

The writ of mandamus shall issue to control any action of executive officers acting without legal authority, *Garfield* v. *United States Ex Rel Golsdby, supra*, footnote at p. 168, L. ed; *Drummey* v. *State Board of Funeral Directors*, 87 P. 2d 848, (Waste) (1939), at p. 853. Mandamus is used to review any deficiency in due process of law resulting from the action of a civil service commission against the rights of a public employee: *Handlon* v. *Belleville*, 71 A. 2d 624, 16 A.L.R. 2d 1118, (Heher), (1950), at p. 1122; *Mc Feely* v. *Board of Pension Com'rs of City of Hoboken*, 62 A. 2d 686, (Heher), (1948), at p. 689.

282

The desirability of these administrative agencies, in charge of technical functions in the art of governing, is too evident for us to intend to curtail their action by making use of some organic prejudices of the judicial conscience. But that does not mean that we should evade the fulfillment of undeclinable constitutional duties. One of them is to make sure that administrative action does not turn into a confiscatory system where individual rights may be destroyed.